**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| IN THE MATTER OF THE COMPLAINT | ) | |
| OF MAJOR GLEN CORPORATION, | ) | |
| ALAN ZDUNEK, and LAWRENCE | ) | Case No. 22-cv-5852 |
| PUDELEK FOR EXONERATION FROM | ) | |
| OR LIMITATION OF LIABILITY | ) | Hon. Steven C. Seeger |
| _____ | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

This case is about a flaming yacht. The *Patriyacht*, a 33-foot pleasure vessel, caught on fire. The boat went up in smoke, and down in flames.

But the *Patriyacht* did not sink to Davey Jones's locker. In fact, at the time of the inferno, it was out of the water. The boat was living the high and dry life in a heated, indoor storage facility. It had resided inside for the last seven months, out of the blue waters of Lake Michigan.

The *Patriyacht* burned and did not survive. And it wasn't alone. Other vessels in the same building were in the same (metaphorical) boat. They suffered damage from the conflagration. The storage facility was damaged, too.

The owner of the boat, Major Glen Corporation, and two of its officers responded to the fire by coming to the federal courthouse. They invoked this Court's admiralty jurisdiction and sought to limit their liability under a federal statute that governs admiralty-related accidents.

As contemplated by the statute, this Court put in place a notice process for any interested claimants to submit claims for damage. The window of opportunity to submit claims was open for months. And then it closed. In the end, after the deadline had passed, this Court entered final judgment and limited Plaintiffs' liability as provided under the federal statute.

A month later, the insurance carrier for the storage facility, Nationwide Casualty Company, suddenly appeared out of the blue. Nationwide filed a motion to vacate the judgment, contending that it lacked adequate notice of the suit – even though its insured had received notice months before the deadline. And more importantly, Nationwide argued that the Court lacked subject matter jurisdiction.

The motion requires the Court to embark on a bumpy ride through the murky waters of admiralty jurisdiction. The journey is not for the faint of heart. At the end of the ride, the Court concludes that there is no admiralty jurisdiction over any tort-based claim. But there is jurisdiction over any contract-based claim.

This Court had admiralty jurisdiction when it approved a limitation of liability for any contract-based claim. So a jurisdictional challenge to that portion of the judgment must fail.

Before the entry of final judgment, Nationwide could have made an argument on the merits about the scope of the waiver of liability. Nationwide could have argued that the statute in question does not allow a limitation of liability for personal contracts. But the time to make merits-based arguments has passed, and a merits-based argument about the scope of the statute is not a jurisdictional problem.

Nationwide argues that it lacked notice, but that argument goes nowhere fast. Nationwide could have asserted a claim during the claims process, which stretched on for months. Nationwide was nowhere to be seen. Nationwide missed the deadline, and showed up on the dock(et) months too late. And now, that ship has sailed.

For the following reasons, the Court grants in part and denies in part Nationwide's motion to vacate. The Court vacates the portion of the judgment about tort-based claims, but denies the motion to vacate the portion of the judgment about contract-based claims.

## Background

### *The Boat*

The voyage begins with the *Patriyacht*, "a 33-foot private pleasure vessel" that cruised the waves of Lake Michigan. *See* Cplt., at ¶ 8 (Dckt. No. 1).

The *Patriyacht* is a Cruisers Yachts 3375 Express, built in 2000. *See* Decl. Vessel Value, at ¶ 4 (Dckt. No. 1-2). The complaint doesn't include a lot of details about this specific vessel, but information about the model isn't hard to find.

The 3375 Express has ample seating in the main cockpit. Down below, it includes a spacious cabin. It features a crescent-shaped dining banquette and a full galley, with a fridge and stove. *See, e.g.*, MarineMax, *2000 Cruisers Yachts 3375 Express For Sale at MarineMax Wrightsville Beach, NC* (Feb. 8, 2021), https://www.youtube.com/watch?v=PYl5TL-1Uvs; Corscia River Marine Surveys, *2000 Cruisers 3375 Express* (Mar. 28, 2019), https://www.youtube.com/watch?v=9VQrinTp6So. The boat can sleep up to six people.

Based on some judicial research, the average 2000 Cruisers 3375 Express sells for around $65,000. *See Cruisers Yacht 3375 Express boats for sale*, BoatTrader, https://www.boattrader.com/boats/make-cruisers-yachts/model-3375-express/ (last visited August 5, 2024).

By the look of things, the *Patriyacht* was a good day waiting to happen:



*See* Pre-Loss Photos of the *Patriyacht* (Dckt. No. 38, at 3 of 6).

The 3375 Express at issue here, the *Patriyacht*, was owned by Major Glen Corporation. *See* Cplt. at ¶ 6 (Dckt. No. 1). Lawrence Pudelek and Alan Zdunek are officers of Major Glen. They are responsible for maintaining and operating the boat. *Id.* at ¶ 7.

### The Storage Arrangement

Lake Michigan is inhospitable to boats during the winter (and sometimes during the summer). So, during the offseason, yachts like the *Patriyacht* spend their time out of the water, often inside a storage facility.

That's where Marine Services comes into play. Marine Services is a full-service marina and boat-brokerage company. It is located in Dolton, Illinois, roughly 20 minutes south of Chicago. Dolton is in between Chicago and Gary, Indiana. It's landlocked, except for the Little Calumet River that connects to Lake Michigan.

As the name suggests, Marine Services provides all sorts of services to boats and boaters. Marine Services changes oil, winterizes boats, shrinkwraps vessels, and so on.[1] It also operates a

---

[1] The website of Marine Services includes overhead video footage that helps to get a sense of the lay of the land and the water. *See* Marines Services Corp., https://www.marineservicescorp.com/ (last visited August 5, 2024). It shows several long docks, each of which is chock-full of fancy white boats. The footage also shows roughly eight large buildings, plus dozens of boats on dry land that are covered or shrinkwrapped.

marina. Boats can travel from the marina, take a trek down the Little Calumet River, and enter the navigable waters of Lake Michigan. *Id.* at ¶ 8.

Marine Services also provides storage space for vessels during the offseason. Marine Services offers a variety of storage services, including indoor and outdoor dry dock storage. *See* Dry Dock & Service Agreement, at 1 (Dckt. No. 34-1).

In August 2021, Major Glen Corporation – the owner of the *Patriyacht* – entered into a contract with Marine Services. Major Glen and Marine Services contracted for "storage and repair of the *Patriyacht*." *See* Zdunek Affidavit, at ¶ 2 (Dckt. No. 34-2).

The parties agreed that Marine Services would provide indoor heated storage for the *Patriyacht* for the winter, beginning in October 2021. *See* Dry Dock & Service Agreement, at 1 (Dckt. No. 34-1). Plaintiffs paid $4,141.67 for the storage service. *Id.* Alan Zdunek signed the agreement on behalf of Major Glen as the owner of the *Patriyacht*. *Id.*

Under the agreement, the *Patriyacht* resided at Marine Services's marina and dry dock facility. *See* Cplt., at ¶ 8 (Dckt. No. 1); *see also* Dry Dock & Service Agreement (Dckt. No. 34-1). And for months, it peacefully rested.

### The Fire

Things took a turn for the (much) worse in May 2022, seven months after the *Patriyacht* began lounging in storage.

The *Patriyacht* wintered inside Building 8, an indoor storage facility at the marina. *See* Cplt., at ¶ 11 (Dckt. No. 1). The *Patriyacht* was a dry boat on dry land. Somehow, a fire broke out in Building 8. *Id.* at ¶¶ 11–12. Water may have helped with the fire, but water was nowhere to be seen.

And then the boat burned.

The complaint doesn't offer any details about the origin or cause of the fire. Maybe the fire began on the *Patriyacht*, someway somehow. Or maybe the *Patriyacht* was simply in the wrong place at the wrong time. Whatever the cause, whatever the reason, the flames caught up with the boat. And the fire came to eat.

The *Patriyacht* caught on fire, and it took a real beating. It fared worse than Chicago in the Great Fire. The vessel suffered a constructive total loss, meaning that the charred remnant was worthless. *Id.* at ¶ 14. The *Patriyacht* sunk to a value of $0. *See* Decl. Vessel Value, at ¶ 6 (Dckt. No. 1-2).

The charred husk of the hull was something to behold. The inside of the *Patriyacht* looked like the inside of a charcoal grill after smoking some pulled pork:

4



*See* Post-Loss Photos of the *Patriyacht* (Dckt. No. 37, at 2, 5, 8, 11 of 11).

The *Patriyacht* wasn't the only boat to go up in flames. Other vessels in Building 8 suffered damage, too. *See* Cplt., at ¶ 13 (Dckt. No. 1). And so did the building itself. *Id.*

### The Aftermath

In the next few months, the insurance carriers and their adjusters arrived on the scene. Nationwide Casualty Company, the carrier for Marine Services, began looking into the fire. So did Intact Insurance, the carrier for Major Glen.

The parties include a lot of details in their filings about the back-and-forth between the carriers, the adjusters, and the consultants. Suffice it to say that the insurance companies sprang into action, trying to figure out what happened, what it would cost, and (presumably) who should pay.

### This Lawsuit

The fire rendered the *Patriyacht* worthless. Major Glen was left with nothing, except a charred vessel and a boatload of potential liability. So, in October 2022, Major Glen and its two

officers (Lawrence Pudelek and Alan Zdunek) filed this lawsuit, invoking this Court's admiralty and maritime jurisdiction. *Id.* at ¶ 1.

Plaintiffs sought relief under the Shipowner's Limitation of Liability Act, 46 U.S.C. § 30501 *et seq.*, which allows a vessel's owner to limit its liability for accidents. Specifically, Plaintiffs sought a finding that "[t]he Fire and any claimed injuries and damages therefrom were not caused or contributed to by any breach of contract, fault, neglect, or wrongdoing on the part of Plaintiffs or anyone for whom they may have been responsible." *Id.* at ¶ 17.

Plaintiffs requested "exoneration from liability for any and all injuries, losses and damages that may be claimed as a result of the Fire." *Id.* at ¶ 19. Plaintiffs sought a finding that they had no liability for any loss or damage related to the fire. *Id.* at 7. Alternatively, they requested a finding that capped their liability and damages to the value of the *Patriyacht* (meaning, $0). *Id.*

So, Plaintiffs wanted a finding of no liability, or a finding of liability totaling nothing.

Plaintiffs also moved for an order "directing issuance of notice of complaint; ordering monition; and restraining prosecution of claims." *See* Pls.' Mtn. for Order (Dckt. No. 5). In maritime cases, a monition is a summons to appear in court as a defendant. *See* Black's Law Dictionary 1206 (11th ed. 2019).

The Court granted Plaintiffs' request for an injunction on November 8, 2022. *See* 11/8/22 Order (Dckt. No. 6). This Court embarked on a process governed by Rule F of the Supplemental Rules for Certain Admiralty and Maritime Claims. *Id.*

Specifically, the Court enjoined any claimants from bringing any claims in any other venue, and required any claims to appear in the case at hand. The Court ordered that "all claims and proceedings against the owners or the owners' property with respect to the matter in question involving the Patriyacht shall cease. The further prosecution of any such action or proceeding is hereby enjoined. The Court orders the issuance of notice of the complaint to interested claimants." *Id.*

This Court also ordered Plaintiffs to sound the whistle and give notice to potential claimants. In fact, this Court directed Plaintiffs to give more notice than they had proposed.

The Court "direct[ed] Plaintiffs to err on the side of providing more notice rather than less, so that potential claimants know about the action." *Id.* So, the Court imposed "expanded notice requirements." *Id.*

In particular, this Court gave claimants more time to assert their rights. *Id.* (noting that the Court had "extended the proposed deadline for potential claims"). Plaintiffs proposed a deadline of January 6, 2023 for any claimants to submit any claims. *See* Draft Notice (Dckt. No. 5-1). This Court extended the deadline to January 20, 2023. *See* 11/8/22 Order, at ¶ 1 (Dckt. No. 7).

As proposed by Plaintiffs, the Court required publication of notice in the Chicago Law Bulletin once a week for four straight weeks before the deadline for filing claims. *Id.* at ¶ 2; *see also* Draft Order (Dckt. No. 5-3). The Court also required Plaintiffs to "mail a copy of said public notice, this Order, and the accompanying Minute Order to every person known to have made any claim against Plaintiffs or the Patriyacht arising out of the alleged fire of May 9, 2022." *See* 11/8/22 Order, at ¶ 2 (Dckt. No. 7).

The Court went beyond Plaintiffs' proposal, too. It directed Plaintiffs to give notice to "specific individuals" and to file a "certificate of service." *See* 11/8/22 Order (Dckt. No. 6).

Specifically, the order required Plaintiffs to "mail a copy of the public notice, this Order, and the accompanying Minute Order to *Marine Services Corporation* and (to the extent that they are different) to the owners of the marina and dry dock facility in question." *See* 11/8/22 Order, at ¶ 3 (Dckt. No. 7) (emphasis added). The Court also ordered Plaintiffs to "mail a copy of the public notice, this Order, and the accompanying Minute Order to Shone Johnson, Bob Wojnovich, Timothy Ryan, Daniel Rizzo and/or the representatives of said individuals." *Id.*

The Court required Plaintiffs to "serve a copy of this Order in the usual manner on the person or persons to be restrained, or their respective attorneys, or representatives." *Id.* at ¶ 6. In addition, the Court ordered Plaintiffs to "file a statement and a certificate of service on the docket confirming compliance with this Order by November 30, 2022." *Id.* at ¶ 4.

Plaintiffs complied with the order. They filed a statement confirming that they had served the required documents on Marine Services, Johnson, Wojnovich, Ryan, and Rizzo. *See* Pls.' Statement & Certificate of Service, at 1, 3 (Dckt. No. 10). Plaintiffs also confirmed the publication of notice in the Chicago Law Bulletin on the schedule set by the Court. *Id.* at 1.

On January 20, 2023 – the deadline for the filing of claims – Progressive Direct Insurance Company filed an answer to the complaint and a claim for $16,843.29 as the subrogated insurer of Wojnovich. *See* Progressive Answer & Claim, at 5 (Dckt. No. 15). After settlement discussions, Progressive and Plaintiffs resolved all claims. *See* 4/18/23 Order (Dckt. No. 25).

The deadline came and went, and no other claimants emerged and filed a claim. This Court waited a few extra months, just to be on the safe side and make sure that no one was coming out of the woodwork.

On April 18, 2023 – three months after the deadline to file any claims – the Court took action on the motion. For starters, the Court found that Plaintiffs had complied with the procedural requirements, including the directives about notice. "Plaintiffs complied with Supplemental Rule F(4) of the Supplemental Rules for Certain Admiralty and Maritime Claims." *See* 4/18/23 Order (Dckt. No. 26).

The Court granted Plaintiffs' motion for an order noting and entering defaults. The Court entered default against "all persons, firms, corporations, and other entities claiming damages for any loss of life, injury, loss, destruction and damage of any kind whatsoever caused by or resulting from the incident that allegedly occurred on May 9, 2022 at the Marine Services

Corporation Marina located at 14001 Cottage Grove Avenue, Dolton, Cook County, Illinois."[2] *See* 4/18/23 Order Noting and Entering Defaults (Dckt. No. 27). The Court ruled that any other potential claimants were "forever barred" from filing any claims relating to the fire and the *Patriyacht*. *Id.*

The Court closed the case. *See* 4/18/23 Order (Dckt. No. 26).

### *The Motion to Vacate*

In May 2023 – four months after the filing deadline, and a month after the Court terminated the case – Nationwide Casualty Company burst onto the scene. It moved to vacate the defaults. *See* Nationwide Mtn. to Vacate (Dckt. No. 29). Nationwide stated that it "had no knowledge of the complaint until May 17, 2023." *Id.* at ¶ 6.

The Court had a few questions about Nationwide's motion. The Court expressed particular interest in "receiving a detailed summary of the notice provided to potential claimants." *See* 5/19/23 Order (Dckt. No. 30). Basically, the Court wanted to confirm whether Marine Services (the insured) and Nationwide (its carrier) had received notice, and if so, when.

The Court directed Nationwide to file supplemental papers confirming: (1) the identity of Nationwide's insured; (2) whether its insured received copies of the public notice, or this Court's orders; (3) whether Nationwide had received those materials; and (4) whether Marine Services – or any other insured of Nationwide – ever gave Nationwide notice of the lawsuit. *Id.*

"Basically, this Court direct[ed] Plaintiffs and Nationwide Casualty to pin down who knew what when, and who told what to whom when." *Id.*

Nationwide responded and pinned down the details. Nationwide confirmed that Marine Services was its insured. *See* Nationwide Mem. in Support of Mtn. to Vacate, at 4 (Dckt. No. 32).

Importantly, Nationwide acknowledged that Marine Services had received notice from Plaintiffs through a letter dated November 16, 2022. That's roughly two months before the claims deadline of January 20, 2023. *Id.*

Plaintiffs' letter dated November 16, 2022 notified Marine Services about the existence of the lawsuit. The letter provided copies of the Complaint for Exoneration from or Limitation of Liability, as well as this Court's orders and the public notice. *Id.* The letter also notified Marine Services about the deadline of January 20, 2023, to submit a claim: "This notice requires

---

[2] Rereading that order with the passage of time, the Court sees that it covers "any loss of life" and "injury" from the fire. *See* 4/18/23 Order Noting and Entering Defaults (Dckt. No. 27). Since then, this Court *sua sponte* spotted a provision of the Limitation Act that expands the potential liability for personal injury or death. *See* 46 U.S.C. § 30524(a). But that provision applies "only to seagoing vessels," and "does not apply to pleasure yachts." *Id.* So, the general provision about the limitation of liability should apply to the *Patriyacht*. And in any event, fortunately no one suffered a personal injury in connection with the fire.

you to file any respective claim you may have in reference to the fire with the Clerk of the Court and to serve on this office a copy thereof on or before January 20, 2023, or be barred from ever pursuing such claims." *See* 11/16/22 Letter (Dckt. No. 32-1, at 10 of 14).

For good measure, the letter from Plaintiffs encouraged Marine Services to pass along the letter to its insurance carrier. "We also recommend that you *forward this letter to your insurance company* should they wish to file a timely claim on your behalf on or before January 20, 2023." *Id.* (emphasis added).

For whatever reason, Marine Services didn't follow that suggestion. Marine Services did not let Nationwide know about the lawsuit, or the claims process, or the deadline. *See* Nationwide Mem. in Support of Mtn. to Vacate, at 4 (Dckt. No. 32).

So, Plaintiffs notified Marine Services about the lawsuit, but Marine Services didn't notify its insurer (Nationwide).

In support of its motion to vacate, Nationwide raised two arguments.

First, Nationwide contends that the Court lacked subject matter jurisdiction over the dispute because the *Patriyacht* was in dry dock storage when it burst into flames. *Id.* In other words, the fire happened on *land*, not in *water*. As Nationwide sees it, the existence of dry land means that there was no admiralty jurisdiction.[3]

Second, Nationwide claims that the final judgment should be vacated because Plaintiffs failed to provide notice to Nationwide. "Plaintiffs knew that Nationwide would likely make a subrogation claim, and knew how to get notice to Nationwide." *Id.* at 6.

## Analysis

### I.    Subject Matter Jurisdiction

As always, the starting point is subject matter jurisdiction. "In every case, the first task of a federal court is to ensure that it has jurisdiction." *Gen. III, LLC v. City of Chicago*, 2021 WL 2939982, at *2 (N.D. Ill. 2021) (Dow, J.). First things first.

Federal courts have limited jurisdiction, and they must stand guard over the limits of their own power. *See United States v. Wahi*, 850 F.3d 296, 299 (7th Cir. 2017). In fact, federal courts have a duty to check the jurisdictional moorings, even if the parties believe that subject matter jurisdiction is intact. *See Fort Bend Cnty. v. Davis*, 587 U.S. 541, 548 (2019) ("Unlike most

---

[3] The parties devoted relatively little attention to the jurisdictional issues, despite their critical importance. The discussion was cursory, to put it mildly. Nationwide's entire motion to vacate was only six pages long, and Nationwide devoted only three paragraphs to the jurisdictional issue. *See* Nationwide Mem. (Dckt. No. 32). Nationwide made a jurisdictional argument and cited only three cases. *Id.* at 4–5. Plaintiffs didn't offer much help, either. Plaintiffs devoted six paragraphs to the jurisdictional issue. *See* Pls.' Resp., at 2–4 (Dckt. No. 34). When it came to the existence of jurisdiction, this Court was marooned on an island, left to forage for case law and fend for itself.

arguments, challenges to subject-matter jurisdiction may be raised by the defendant 'at any point in the litigation,' and courts must consider them *sua sponte*.") (quoting *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012)).

That unflinching obligation continues even on a motion to vacate a judgment. *See, e.g.*, *Trend Intermodal Chassis Leasing LLC v. Zariz Transp. Inc.*, 2024 WL 117155, at *3 (N.D. Tex. 2024); *EFKO Food Ingredients Ltd. v. Pac. Inter-Link SDN BHD*, 582 F. Supp. 2d 466, 468–69 (S.D.N.Y. 2008). There is no safe harbor for a judgment if it is not tethered to solid jurisdictional ground.

The Constitution empowers federal courts to hear "all Cases of admiralty and maritime Jurisdiction." *See* U.S. Const. art. III, § 2. Congress codified that power in 28 U.S.C. § 1333, granting federal district courts jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction." *See* 28 U.S.C. § 1333(1).

Admiralty and maritime jurisdiction sound similar, but they're not quite the same. Basically, maritime law "refer[s] to the entire body of laws, rules, legal concepts and processes that relate to the use of marine resources, ocean commerce, and navigation. Admiralty law is both narrower and broader than maritime law: it is narrower in the sense that it refers only to the private law of navigation and shipping; it is broader in that it covers inland as well as marine waters." *See* 1 T. Schoenbaum, Admiralty & Maritime Law § 1:1 (6th ed. 2023).

Plaintiffs invoked this Court's admiralty jurisdiction, and filed suit under the Shipowner's Limitation of Liability Act, 46 U.S.C. § 30501 *et seq. See* Cplt., at ¶ 1 (Dckt. No. 1). That statute limits the liability of the owners of a vessel, by capping liability at the *value* of the vessel.

Congress passed the Limitation Act in the antebellum era (in 1851) to encourage shipping and shipbuilding. *See Richardson v. Harmon*, 222 U.S. 96, 103 (1911) ("The avowed purpose of the original act was to encourage American investments in ships.").

At the time, shipowners had common carrier liability, which means that they could be held liable even if they personally did nothing wrong. *See Joyce v. Joyce*, 975 F.2d 379, 383 (7th Cir. 1992) ("In 1848, American shipowners were moved by a similar sense of competitive disadvantage after several incidents in which shipowners were held liable for significant damage amounts under the common law rule of common carrier liability, which did not require proof that the owner was negligent or at fault. In 1851, Congress responded to this concern by enacting the Limitation of Shipowner's Liability."); *Norwich Co. v. Wright*, 80 U.S. (13 Wall.) 104, 121, 20 L.Ed. 585 (1871) ("The great object of the law was to encourage ship-building and to induce capitalists to invest money in this branch of industry."); *Pickle v. Char Lee Seafood, Inc.*, 174 F.3d 444, 449 (4th Cir. 1999) ("Congress designed the Limitation Act 'to induce the heavy financial commitments the shipping industry requires by mitigating the threat of a multitude of suits and the hazards of vast, unlimited liability as the result of a maritime disaster.'") (citation omitted).

Congress promoted the industry by "exempting innocent shipowners from liability, beyond the amount of their interest." *See Norwich*, 80 U.S. (13 Wall.) at 121. "Congress

intended the principal beneficiaries of the Act to be innocent shipowners and investors who were sued for damages caused through no fault or neglect of their own." *Joyce*, 975 F.3d at 384.

The statute limits liability to the value of the ship and what's on it, except in cases involving personal injury or death. "[T]he liability of the owner of a vessel for any claim, debt, or liability described in subsection (b) shall not exceed the value of the vessel and pending freight." *See* 46 U.S.C. § 30523(a).

The next subsection pins down the scope of the limitation of liability. The "claims, debts, and liabilities subject to limitation under subsection (a) are those arising from any embezzlement, loss, or destruction of any property, goods, or merchandise shipped or put on board the vessel, any loss, damage, or injury by collision, or any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of the owner." *See* 46 U.S.C. § 30523(b).

The statutory language is a bit of a mouthful. *See* 2 T. Schoenbaum, Admiralty & Maritime Law § 15:1 (6th ed. 2023) ("This 1851 Act, badly drafted even by the standards of the time, continues in effect today."). It might help to insert some numbers, to make things easier to digest.

Viewing the statute a second time, the limitation of liability applies to "claims, debts, and liabilities . . . arising from [1] any embezzlement, loss, or destruction of any property, goods, or merchandise shipped or put on board the vessel, [2] any loss, damage, or injury by collision, or [3] any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of the owner." *See* 46 U.S.C. § 30523(b).

So, to paraphrase the text in plain English, the statute applies to (1) a loss of property on a boat; (2) a loss from a collision; and (3) a loss incurred without the "privity or knowledge of the owner." *Id.*

"The Limitation Act, thus, seeks to shield from liability 'innocent shipowners and investors' who had no 'personal participation . . . in the fault or negligence which caused or contributed to the loss or injury.'" *Matter of Complaint of Ingram Barge Co.*, 219 F. Supp. 3d 749, 822 (N.D. Ill. 2016) (St. Eve, J.), *aff'd sub nom. Alexander v. Ingram Barge Co.*, 876 F.3d 269 (7th Cir. 2017) (quoting *Great Lakes Dredge & Dock Co. v. City of Chicago*, 3 F.3d 225, 231 (7th Cir. 1993)).

Admiralty jurisdiction provides the jurisdictional footing for the statute. The Limitation Act "allows district courts, under their admiralty jurisdiction conferred by 28 U.S.C. § 1333(1), to determine whether a shipowner's liability should be limited when that liability may be predicated on an act that was not within the shipowner's 'privity or knowledge.'" *Joyce*, 975 F.2d at 383; *see also In re the Complaint of RQM, LLC*, 2011 WL 98472, at *4 (N.D. Ill. 2011) (St. Eve, J.).

Jurisdiction under the Limitation Act is coextensive with jurisdiction under section 1333, meaning the admiralty jurisdiction statute. *See Complaint of Sisson*, 867 F.2d 341, 348–50 (7th

Cir. 1989), *rev'd on other grounds*, 497 U.S. 358 (1990); *Matter of Martz*, 672 F. Supp. 3d 711, 719 (D. Alaska 2023). So, a plaintiff can bring a claim under the Limitation Act only if there is admiralty jurisdiction.

All too often, it is no small task to figure out if admiralty jurisdiction exists. It depends on the nature of the claim at issue. "Extensive 'tests' have been developed by the courts to differentiate [admiralty] claims from 'land law' civil claims." *See* 1 T. Schoenbaum, Admiralty & Maritime Law § 3:1 (6th ed. 2023). Some claims arise in tort, and some claims arise in contract.

"The test for determining whether a cause of action arising in tort falls within a court's admiralty jurisdiction is distinct from the test for determining whether a contract dispute falls within a court's admiralty jurisdiction." *Dockside Dev. Corp. v. Illinois Int'l Port Dist.*, 479 F. Supp. 2d 842, 845 (N.D. Ill. 2007); *see also N. Pac. S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co.*, 249 U.S. 119, 125 (1919).

The parties disagree about whether this case sounds in tort or in contract. *Compare* Nationwide's Mem., at 4–5 (Dckt. No. 32) (citing cases about admiralty jurisdiction for tort claims), *with* Pls.' Resp., at 2–4 (Dckt. No. 34) (asking the Court to view the case at hand as a contract case).

The complaint uses lingo that evokes both tort *and* contract. "The Fire and any claimed injuries and damages therefrom were not caused or contributed to by any *breach of contract*, *fault, neglect*, or *wrongdoing* on the part of Plaintiffs or anyone for whom they may have been responsible, but rather, was caused in whole or in part by the *breach of contract*, *fault*, *carelessness*, and *negligence* of third-parties for whom Plaintiffs were not responsible . . . ." *See* Cplt., at ¶ 17 (Dckt. No. 1) (emphasis added).

Plenty of words – "fault," "neglect," "wrongdoing," "carelessness," and "negligence" – sound like the complaint is about limiting liability for a potential tort claim. And the phrase "breach of contract" makes clear that the complaint covers a potential contract claim, too. So, the complaint seeks to limit the owner's tort liability and contract liability.

The Court will consider whether it has subject matter jurisdiction over any potential tort claims, before turning to jurisdiction over any potential contract claims.

**A.       Jurisdiction for Tort Claims**

The first question is whether this Court has subject matter jurisdiction over a claim for a limitation of liability about potential tort claims. Based on the allegations at hand, any such tort claim falls outside the Court's admiralty jurisdiction.

A "party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995); *see also Sisson v. Ruby*, 497 U.S. 358, 363–65 (1990).

12

In other words, the test has two components: location and connection. A complaint must satisfy both requirements to fall within admiralty jurisdiction for a tort claim.

When applying the "location" test, the Court "must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water." *Grubart*, 513 U.S. at 534.

A boat that collides with another boat on the high seas is a good example. So is a pirate ship that shoots a cannonball and nails a house on shore. Basically, for the location test to apply, something needs to be wet.

The "connection" test involves two questions. First, did the incident have a "potentially disruptive impact on maritime commerce"? *See Sisson*, 497 U.S. at 363. Second, was there a "substantial relationship between the activity giving rise to the incident and traditional maritime activity"? *Id.* at 346.

The Court takes up the "location" test first. That's where the claim runs aground.

The *Patriyacht* was not on navigable water when it went up in flames. It was on *land*. It was a dry boat on dry land. And Plaintiffs don't allege that the fire started on Lake Michigan before making its way ashore. The fire didn't arise because of anything that was floating, submerged, or even moist.

Other courts have concluded that tort claims flunk the "location" test in near-identical circumstances. *See, e.g., David Wright Charter Serv. of N.C., Inc. v. Wright*, 925 F.2d 783, 784 (4th Cir. 1991) ("Seals's claim for wrongful death and Wright's claim for personal injuries caused by the fire and explosion on Charter's vessel while it was on blocks in a shed do not satisfy the situs test for admiralty jurisdiction."); *Complaint of Dickenson*, 780 F. Supp. 974, 974 (E.D.N.Y. 1992) (concluding that the court lacked admiralty jurisdiction over Limitation Act claims about "alleged tortious acts relating to a fire that completely destroyed the vessel"); *In re Carter*, 743 F. Supp. 2d 103, 107 (D. Conn. 2010) (concluding that the court lacked admiralty jurisdiction because "the fire at issue in this case began on land and occurred *solely* on land") (emphasis in original); *Complaint of Seawise, Inc.*, 975 F. Supp. 1466, 1468 (M.D. Fla. 1997) (holding that the location component of the tort test was not satisfied because "the vessel was not on navigable waters when the fire erupted").[4]

There is no admiralty or maritime jurisdiction over a tort claim about a dry boat, in a dry building, on dry land, that bursts into flames. Admiralty or maritime jurisdiction does not reach that far on shore.

---

[4] As an aside, it may surprise the reader how often boats set on fire. After all, boats are typically in near-reach of water, fire's foe. But as the Supreme Court noted, "fire is one of the most significant hazards facing commercial vessels," and presumably recreational vessels too. *See Sisson v. Ruby*, 497 U.S. 358, 362 (1990). Of all things, one case involved a fire aboard a boat named *Burned Out*. *See Matter of Pennypacker*, 2016 WL 4705535 (D. Md. 2016).

That's enough to end the jurisdictional voyage. The fire occurred while the *Patriyacht* was tucked away indoors in Building 8, not while it was out on the high seas. The fire apparently started on land and ended on land. So, this case can't get by the location prong of the tort test for admiralty or maritime jurisdiction.

If there is not admiralty or maritime jurisdiction, the Limitation Act can't cover it. The Limitation Act does not extend beyond the boundaries of admiralty and maritime jurisdiction. It's an island in that jurisdictional sea.

In sum, the tort-based claim fails the location test, so there is no need to address the connection test. The Court lacks subject matter jurisdiction to the extent that the complaint seeks to limit liability for any tort-based claim under the Limitation Act.

### B.      Jurisdiction for Contract Claims

The next question is whether this Court has admiralty jurisdiction to the extent that the complaint seeks a limitation of liability for any contract claim. Answering that question is a more difficult journey.

"The boundaries of admiralty jurisdiction over contracts – as opposed to torts or crimes – being conceptual rather than spatial, have always been difficult to draw." *Kossick v. United Fruit Co.*, 365 U.S. 731, 735 (1961). "If the nature and character of the contract is maritime, that is to say, if the contract is related to a maritime service or a maritime transaction, there is admiralty jurisdiction." *See* 1 Benedict on Admiralty § 181 (7th ed. 2024).

"Vessel storage contracts" are a "well-established" "type[] of contract[] that invoke[s] admiralty jurisdiction." *See* 1 T. Schoenbaum, Admiralty & Maritime Law § 3:10 (6th ed. 2023). "[I]t is . . . widely accepted that a contract to store a boat for the winter season is a maritime contract – even in the absence of a repair provision, and regardless of whether the boat is kept on land or in water." *Matter of Pennypacker*, 2016 WL 4705535, at *3 (D. Md. 2016); *see also Medema v. Gombo's Marina Corp.*, 97 F.R.D. 14, 16 (N.D. Ill. 1982) ("After careful consideration of the question, this court . . . holds that a contract to store a boat for a winter season falls within a federal court's admiralty jurisdiction."); *Omaha Indem. Co. v. Whaleneck Harbor Marina, Inc.*, 610 F. Supp. 154, 156 (E.D.N.Y. 1985) (adopting the reasoning of the *Medema* court).

Based on that case law, a contract claim about the winter storage contract between Plaintiffs and Marine Services would fall within this Court's admiralty jurisdiction. When it comes to contract claims, admiralty jurisdiction goes with the boat, even when the boat is on land.

For example, imagine if the Skipper entered into a contract for Thurston Howell to store the *S.S. Minnow* over the winter months in an indoor storage facility in Hawaii. And imagine if Thurston Howell breached the contract by leaving the boat outdoors, fully exposed to the elements. The Skipper could bring a breach-of-contract claim for any harm to the boat, and a court would have admiralty jurisdiction.

14

But there is another wrinkle. The case at hand isn't your run-of-the-mill breach-of-contract case. Remember, this case arises under the Limitation Act. *See* Cplt., at 1 (Dckt. No. 1).

Again, the Act allows a shipowner to avoid liability for "claims, debts and liabilities" that are "done, occasioned, or incurred, without the privity or knowledge of the owner." *See* 46 U.S.C. § 30523.

The last phrase is a significant carveout. The Limitation Act applies if the loss occurs "without the privity or knowledge" of the owner. *Id.* On the flipside, the Limitation Act doesn't apply if the loss occurred *with* the privity or knowledge of the owner. In short, if the shipowner had privity or knowledge, then the shipowner cannot avoid liability.

The Seventh Circuit has called attention to the breadth of the carveout for the "privity or knowledge" of the shipowner. "Privity or knowledge is not tantamount to actual knowledge or direct causation. All that is needed to deny limitation is that the shipowner, by prior action or inaction set into motion a chain of circumstances which may be a contributing cause even though not the immediate or proximate cause of a casualty." *In re Oil Spill by Amoco Cadiz off Coast of France on March 16, 1978*, 954 F.2d 1279, 1303 (7th Cir. 1992) (cleaned up).

"[I]t has long been held that '[p]rivity and knowledge is a term of art meaning complicity in the fault that caused the accident.'" *See Bensch v. Est. of Umar*, 2 F.4th 70, 73 (2d Cir. 2021) (citation omitted); *see also Coryell v. Phipps*, 317 U.S. 406, 411 (1942) ("In the case of individual owners it has been commonly held or declared that privity as used in the statute means some personal participation of the owner in the fault or negligence which caused or contributed to the loss or injury.").

"The recent judicial trend has been to enlarge the scope of activities within the 'privity or knowledge' of the shipowner, including imputing to corporations knowledge or privity of lower-level employees; requiring shipowners to exercise an ever-increasing degree of supervision and inspection; imposing a heavy burden on shipowners to prove their lack of privity or knowledge; rendering the shipowner's duty to ensure the seaworthiness of the ship nondelegable; and narrowing the group of potential defendants eligible for exoneration under the Act." *Amoco*, 954 F.2d at 1303–04 (citations omitted).

Here, the burden rests on Plaintiffs to show a lack of privity or knowledge. "In limitations proceedings, the ultimate burden of proving lack of privity or knowledge is on the shipowner." *Id.* at 1303.

Plaintiffs have not met that burden. There is a tidal wave of authority flowing in the other direction. A shipowner cannot avoid liability under the Limitation Act for a personal contract.

More than a century ago, the Supreme Court ruled that the Limitation Act does not protect shipowners from liability for breach-of-contract claims. *See Richardson v. Harmon*, 222 U.S. 96, 106 (1911) (explaining that the Limitation Act "leaves [a shipowner] liable for his own

fault, neglect, and contracts"); *Am. Car & Foundry Co. v. Brassert*, 289 U.S. 261, 264 (1933) ("The liability thus limited is an imputed liability; it is a liability imputed by law by reason of the ownership of the vessel. For his own fault, neglect, and contracts the owner remains liable."); *Pendleton v. Benner Line*, 246 U.S. 353, 356 (1918); *Coryell*, 317 U.S. at 410 ("The limitations acts have long been held not to apply where the liability of the owner rests on his personal contract.") (collecting cases); *see also* 2 T. Schoenbaum, Admiralty & Maritime Law § 15:3 (6th ed. 2023) (explaining that "an exception to limitation is carved out for claims under personal contracts of the shipowner").

"Personal contracts entered into by a shipowner are not subject to the Limitation Act. The Supreme Court has held that while shipowners can limit their liability under the Limitations Act for acts of the master and crew arising out of the conduct of the master and crew, the shipowner remains liable for his own fault, neglect, and contracts." *See Trico Marine Assets, Inc. v. Diamond B Marine Servs., Inc.*, 2001 WL 946362, at *3 (E.D. La. 2001); *see also Mediterranean Shipping Co. S.A. Geneva v. POL-Atlantic*, 229 F.3d 397, 403 (2d Cir. 2000).

"The personal contract exception prevents shipowners and bareboat charterers from attempting to limit liability that they have contracted to bear." *See Mediterranean Shipping Co. S.A. Geneva*, 229 F.3d at 403; *see also Signal Oil & Gas Co. v. Barge W-701*, 654 F.2d 1164, 1168 (5th Cir. 1981) (stating that the personal-contract doctrine "deprives a shipowner of the benefits of limitation and exposes him to the full burden of liability his actions produced").

The concept is a variation of "you break it, you buy it." If the shipowner signed and broke the contract, the shipowner has bought liability. *See* 2 T. Schoenbaum, Admiralty & Maritime Law § 15–8, at 318 (6th ed. 2023) ("In application this is an equitable doctrine based on the proposition that a shipowner should not be able to promise an undertaking or performance that was within his personal control and then turn around and limit liability when his performance was faulty.").

That body of case law forecloses any claim by Plaintiffs under the Limitation Act. The owner of the *Patriyacht* entered into an agreement with Marine Services to store the boat over the winter. That's a personal contract. It is difficult to envision any scenario where a loss from a breach of contract did not involve the shipowner's privity or knowledge.

So the Limitation Act does not protect the owners of the *Patriyacht* after all. The statute does not apply because the statute does not limit liability for breach-of-contract claims based on agreements signed by the shipowners.

That conclusion raises a secondary question. If the Limitation Act doesn't apply, is that a jurisdictional problem, or a merits problem? That is, imagine a world in which the Limitation Act does not limit liability for a particular cause of action. Does that mean that the claim fails on the merits, or does that mean that the Court lacks subject matter jurisdiction?

Remember, this Court already entered final judgment, concluding that the Limitation Act covered any claims involving potential claimants. This Court reached that conclusion because

no claimant asserted a claim (and no one pushed back on the limits of the Act, either). And now, Nationwide seeks to vacate that judgment for lack of subject matter jurisdiction.

It is hard to see why the problem isn't a merits problem, instead of a jurisdictional problem.

Go back to the hypo about the Skipper. Again, this Court has admiralty jurisdiction over a contract to store a vessel. *See* 1 T. Schoenbaum, Admiralty & Maritime Law § 3:10 (6th ed. 2023); *Pennypacker*, 2016 WL 4705535, at *3. So, this Court would have jurisdiction if the Skipper brought a claim against Thurston Howell for breaching the contract to store the *S.S. Minnow*.

Admiralty jurisdiction would attach to that breach-of-contract claim. If that's the case, then it is hard to see why a court would lack admiralty jurisdiction if the Skipper tweaked the claim. Imagine if the contract required the Skipper not to store Gilligan's dynamite on the *S.S. Minnow*. And imagine if the Skipper forgot all about it, and the *S.S. Minnow* later blew up and destroyed the marina. And then, imagine if the Skipper sued Thurston Howell under the Limitation Act to limit his liability for breach of contract.

Essentially, the Skipper would be playing defense, not offense. The Skipper would have no claim under the Limitation Act (for the reasons explained above) because the statute doesn't cover personal contracts. But that's a merits problem, not a jurisdictional problem.

If the Court has admiralty jurisdiction over a claim by the Skipper when Thurston Howell breaches the contract, then it is hard to see why the Court would not have admiralty jurisdiction over a claim by the Skipper that tries to limit his own liability under the contract. If jurisdiction applies when a plaintiff plays offense, then surely jurisdiction applies when a plaintiff plays defense.

Seventh Circuit case law on this topic has not always sailed in a straight line. In *Joyce*, the Seventh Circuit affirmed the dismissal of a claim for lack of subject matter jurisdiction when the claim did not fall within the Limitation Act. *See Joyce*, 975 F.2d at 387. But later Seventh Circuit case law has cast that conclusion into doubt.

"*Joyce* states that the dismissal was for lack of subject matter jurisdiction. This contention is *likely inaccurate* – the Supreme Court, though in dicta, has stated that failure to demonstrate lack of privity or knowledge does not divest the district court of jurisdiction." *See Complaint of McCarthy Bros. Co. / Clark Bridge*, 83 F.3d 821, 827 n.1 (7th Cir. 1996) (emphasis added).

Older Supreme Court case law supports the notion that a failure to fall within the Limitation Act is not a jurisdictional problem. "When the jurisdiction of the court in admiralty has attached through a petition for limitation, the jurisdiction to determine claims is not lost merely because the shipowner fails to establish his right to limitation." *See Just v. Chambers*, 312 U.S. 383, 386 (1941); *see also Langnes v. Green*, 282 U.S. 531, 534–35 (1931) ("[W]e are of opinion that the second contention [about the existence of privity or knowledge], upon which

the decree below was predicated, did not pre a jurisdictional question. The District Court had jurisdiction to pass upon the sufficiency of the pleadings and to decide the question upon the evidence; and a determination thereof either way, whether right or wrong, would have been a determination by that court upon the merits in the proper exercise of its jurisdiction.").

If anything, recent cases from the Supreme Court have strengthened that conclusion. Time and again, the Supreme Court has drawn brighter and brighter lines between merits questions and jurisdictional questions.

The Supreme Court has reminded lower courts to proceed cautiously before reading jurisdictional implications into statutory requirements. *See, e.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) ("It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.,* the courts' statutory or constitutional *power* to adjudicate the case.") (emphasis in original); *Biden v. Texas*, 597 U.S. 785, 801 (2022) ("[T]he question whether a court has jurisdiction to grant a particular remedy is different from the question whether it has subject matter jurisdiction over a particular class of claims."); *Kontrick v. Ryan*, 540 U.S. 443, 454 (2004) ("'Jurisdiction,' the Court has aptly observed, 'is a word of many, too many, meanings.'") (citation omitted).

"Because the consequences that attach to the jurisdictional label may be so drastic, we have tried in recent cases to bring some discipline to the use of this term. We have urged that a rule should not be referred to as jurisdictional unless it governs a court's adjudicatory capacity, that is, its subject-matter or personal jurisdiction." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435 (2011); *see also Wilkins v. United States*, 598 U.S. 152, 158 (2023) ("Given this risk of disruption and waste that accompanies the jurisdictional label, courts will not lightly apply it to procedures Congress enacted to keep things running smoothly and efficiently."); *Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 275 (2022) ("We do not read a statute or rule to impose a jurisdictional requirement unless its language clearly does so."); *Sebelius v. Auburn Regional Med. Ctr.*, 568 U.S. 145, 153 (2013) ("To ward off profligate use of the term 'jurisdiction,' we have adopted a readily administrable bright line for determining whether to classify a statutory limitation as jurisdictional. We inquire whether Congress has clearly state[d] that the rule is jurisdictional; absent such a clear statement, we have cautioned, courts should treat the restriction as nonjurisdictional in character.") (cleaned up; brackets in original).

The Supreme Court has tightened the ship when it comes to what counts as a jurisdictional requirement. The trend in the law is against jurisdictionalizing run-of-the-mill statutory requirements. This Court is mindful of which way the jurisdictional winds are blowing.

The provision of the Limitation Act in question does not speak to the power of a district court to adjudicate a certain type of case. In fact, it does not address courts at all. Instead, it draws a boundary line that defines the scope of a limitation of liability. It speaks to the merits and the substance of a claim, not to the power of a court to hear it.

Over and over, the Supreme Court has distinguished between jurisdictional provisions and provisions that merely establish a claim-processing rule. *See Fort Bend Cnty. v. Davis*, 587

18

U.S. 541, 548–49 (2019) ("The Court has therefore stressed the distinction between jurisdictional prescriptions and nonjurisdictional claim-processing rules, which 'seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times.'") (citation omitted); *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012); *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 161 (2010) ("Courts . . . have sometimes mischaracterized claim-processing rules or elements of a cause of action as jurisdictional limitations, particularly when that characterization was not central to the case, and thus did not require close analysis. Our recent cases evince a marked desire to curtail such drive-by jurisdictional rulings, which too easily can miss the critical differences between true jurisdictional conditions and nonjurisdictional limitations on causes of action.") (cleaned up).

The provision of the Limitation Act at issue here isn't even a claim-processing rule. It does not impose any procedural hoops that a plaintiff must jump through to get into the federal courthouse. It merely defines the substance of a claim. If a claim-processing rule does not construct a jurisdictional barrier, it is difficult to see how a provision about "privity or knowledge" in the Limitation Act could pose a jurisdictional hurdle.

To be sure, there is some case law in this Circuit suggesting that the Limitation Act imposes jurisdictional requirements, based on the conclusion in *Joyce*. *See, e.g.*, *Palermo v. Schaedel*, 2023 WL 6213706, at *6 (N.D. Ill. 2023); *In re Talbott*, 572 F. Supp. 3d 564, 567 (N.D. Ind. 2021); *RQM*, 2011 WL 98472, at *4; *Matter of Soso*, 2007 WL 9814729, at *2 (N.D. Ill. 2007) (noting that "there has been some disagreement since *Joyce v. Joyce* was issued regarding whether this sort of dismissal should be for a lack of subject matter jurisdiction or for a failure to state a claim under the Limitation Act").

But *McCarthy Bros.* eroded the foundation of *Joyce*, and later case law has washed it all away. There is nothing left.

In the end, there was a problem at the beginning of the case. Plaintiffs sought to limit their liability under the Limitation Act for a breach-of-contract claim, but the Act does not apply to a personal contract. That's a problem. But it wasn't a *jurisdictional* problem. It was a merits problem.

Since then, this Court entered final judgment. Nationwide cannot challenge the judgment on jurisdictional grounds, because there was jurisdiction from the get-go. So the challenge to the judgment on jurisdictional grounds fails to the extent that the judgment applied to breach-of-contract claims. To the extent that it is a merits challenge, it is too late.[5]

---

[5] A district court could exercise supplemental jurisdiction over a non-admiralty claim if it has admiralty jurisdiction (and thus subject matter jurisdiction) over another part of the case. *See Matter of Pennypacker*, 2016 WL 4705535, at *3 (D. Md. 2016). "[W]hen federal subject-matter jurisdiction can be predicated on Section 1333, because it involves an admiralty, maritime, or prize matter, the requirements of Section 1367(a) for supplemental jurisdiction should be satisfied since the district court's subject-matter jurisdiction over the case would not be founded solely on diversity of citizenship and therefore would not fall within the exceptions to the court's supplemental jurisdiction set out in Section 1367(b)." *See* 14A Wright & Miller, Federal Practice and Procedure § 3673 (4th ed. 2024). "Even if the district court determines that admiralty jurisdiction does not extend over the land-based nuisance claims

## II.     Notice.

One final argument remains.  Nationwide challenges the judgment for lack of notice.

That argument is on the high road to nowhere.  This Court presided over a claims process, and ordered Plaintiffs to serve notice on Marine Services, the insured.  *See* 11/8/22 Order, at ¶ 3 (Dckt. No. 7) (emphasis added).  That notice was above and beyond notice by publication.

Plaintiffs complied.  As Nationwide later admitted, Marine Services received notice from Plaintiffs through a letter dated November 16, 2022.  *See* Nationwide Mem. in Support of Mtn. to Vacate, at 4 (Dckt. No. 32).  That's roughly two months before the claims deadline of January 20, 2023.

Plaintiffs' letter notified Marine Services about the existence of the lawsuit, and the need to submit a claim by January 20, 2023.  "This notice requires you to file any respective claim you may have in reference to the fire with the Clerk of the Court and to serve on this office a copy thereof on or before January 20, 2023, or be barred from ever pursuing such claims."  *See* 11/16/22 Letter (Dckt. No. 32-1, at 10 of 14).

The letter encouraged Marine Services to pass along the letter to its insurance carrier. "We also recommend that you *forward this letter to your insurance company* should they wish to file a timely claim on your behalf on or before January 20, 2023."  *Id.* (emphasis added).

An insurer stands in the insured's shoes.  "It is settled that, as a general rule, an insurer steps into the shoes of the insured and acquires no greater or lesser rights than those of the insured."  *Am. Nat. Fire Ins. Co. ex rel. Tabacalera Contreras Cigar Co. v. Yellow Freight Sys., Inc.*, 325 F.3d 924, 936 (7th Cir. 2003) (cleaned up).  An insurer cannot have more and better rights when it comes to the need to file a timely claim.

This Court ordered Marine Services and all other potential claimants to submit a claim by January 20, 2023.  Marine Services knew about the deadline, and had no right to assert a claim

---

. . . the district court could still exercise supplemental jurisdiction over the land-based claims."  *In re Bertucci Contracting Co., LLC*, 544 F. App'x 308, 316 (5th Cir. 2013); *see also Leather's Best, Inc. v. S. S. Mormaclynx*, 451 F.2d 800, 811 (2d Cir. 1971) ("[A] federal court vested with admiralty jurisdiction over a shipper's claim against the carrier for breach of contract of carriage does have the 'power' also to entertain its state tort claim against a pier operator."); *Cargo Logistics Int'l, LLC v. Overseas Moving Specialists, Inc.*, 557 F. Supp. 3d 381, 390 (E.D.N.Y. 2021) ("[W]hile the Court does not have admiralty tort jurisdiction over the tort claims, the Court exercises supplemental jurisdiction based on the Court's admiralty jurisdiction over Plaintiff's contract claim.");  *Dao v. Knightsbridge Int'l Reinsurance Corp.*, 15 F. Supp. 2d 567, 576 (D.N.J. 1998) (exercising supplemental jurisdiction over tort claims because the court had admiralty jurisdiction over a maritime insurance contract claim).  So, this Court could have exercised supplemental jurisdiction over the tort claim because it had admiralty jurisdiction over the contract claim.  Even so, the exercise of supplemental jurisdiction is "purely discretionary."  *See Shea v. Koehler*, 830 F. App'x 781, 783 (7th Cir. 2020); 28 U.S.C. § 1367(c).  No party raised supplemental jurisdiction, so the Court won't exercise it.  The briefs were cursory, and at some point, this Court will not reach out and make arguments that the parties didn't make for themselves.

months after the fact.  So its insurance company had no such right, either.  If Marine Services was out of time, then Nationwide is out of luck.

Maybe Marine Services dropped the ball, by failing to tell its insurance company about the lawsuit and the claims process.  Maybe that's a reason for Nationwide and Marine Services to have a follow-up conversation.  But that's not a reason to undo the judgment.

### Conclusion

The motion to vacate the judgment is granted in part and denied in part.  The Court vacates the judgment to the extent that the complaint covered potential tort claims, because there was no subject matter jurisdiction.  The Court does not vacate the judgment to the extent that the complaint covered potential contract claims, because there was subject matter jurisdiction.

This Court will issue an amended judgment.

Date:   August 5, 2024

Steven C. Seeger
United States District Judge